UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DENISE JEANNE LATOUR-DARCH,

                Plaintiff,

- against -

CAROLYN W. COLVIN, ACTING
COMMISIONER OF SOCIAL SECURITY,

                Defendant.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**

14-cv-3000 (SLT)

**TOWNES, United States District Judge,**

Plaintiff Denise Jeanne Latour-Darch ("Plaintiff") commenced this action against the Commissioner of Social Security ("Commissioner") on May 6, 2014, pursuant to 42 U.S.C. §405(g), seeking judicial review of the Commissioner's final decision denying disability insurance benefits under Title II of the Social Security Act. Currently before the Court are the parties' cross-motions for judgment on the pleadings. (Docs. 13 and 15.) The Commissioner requests that her final decision, which affirms the determination of Administrative Law Judge ("ALJ") April M. Wexler, be affirmed. Plaintiff challenges the ALJ's decision on various grounds. Because the ALJ failed to properly apply the treating physician rule, the Court grants Plaintiff's motion for judgment on the pleadings to the extent that it seeks remand, denies the Commissioner's motion on the pleadings, and remands the action for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Procedural History

On October 11, 2011, Plaintiff filed an application for disability insurance benefits alleging a disability onset date of April 15, 2011. (Tr. 147-153.)[1] Plaintiff's claim was denied on January 25, 2012. (Tr. 91-98.) On January 27, 2012, Plaintiff submitted a request for a hearing before an ALJ, which was subsequently held on October 26, 2012, before ALJ April M. Wexler in Jericho, New York. (Tr. 53, 99-100.) Plaintiff, represented by counsel, appeared in person and gave testimony. (Tr. 53-85.) Rocco J. Meola, an impartial Vocational Expert, appeared and testified by telephone. (Tr. 53, 81-83.)

On December 20, 2012, the ALJ issued her decision finding Plaintiff was not disabled. (Tr. 12-26.) Plaintiff requested a review of the ALJ's decision by the Appeals Council on February 22, 2013, but the Appeals Council declined Plaintiff's request on March 28, 2014, and the ALJ's decision became final. (Tr. 8-11, 1-4.)

### B. Factual Background

#### 1. The Injury and Alleged Onset of Disability

Plaintiff was born on March 31, 1969 and was 42-years-old at the time she filed for disability benefits. (Tr. 147-148.) Plaintiff completed the twelfth grade and has completed no other advanced schooling or job training. (Tr. 166.) She lives at home with her husband and teenage daughter. (Tr. 58.) From 1988 through August 2010, Plaintiff worked full time as a stenographer/administrator for the Board of Cooperative Educational Services ("BOCES"). (Tr. 59-60, 166.)[2]

---

[1] Citations to "Tr." refer to the Administrative Record, docket number 18.
[2] The record indicates *de minimus* earnings from part-time retail positions. (R. 61-62.)

2

The origins of Plaintiff's alleged disability lie in an injury she sustained on August 12, 2010. On that day, Plaintiff experienced acute neck pain radiating to her right arm and hand while moving boxes at work. (Tr. 209.) An MRI performed on August 21, 2010 showed a small leftward disc protrusion at the C5-6 level. (Tr. 208.) The radiology report stated that the protrusion produced "mild effacement of the anterior left lateral subarachnoid space at this level." (*Id.*) It also noted that "[t]there is no significant central canal stenosis or neural foraminal narrowing at C5-6." (*Id.*) As result of her injury, Plaintiff took approximately 2 months off from work until October 18, 2010, when she resumed full duty. (Tr. 210.)

During her time away from and after her return to work, Plaintiff received treatment for acute neck and right arm pain until April 25, 2011. (*Id.*) On that date Plaintiff left work for two weeks due to her pain, temporarily resumed work for two-and-a-half days, then left work permanently on May 11, 2011. (*Id.*) Plaintiff alleges that her disability began on April 25, 2011. (Memorandum of Law in Support of Plaintiff's Cross Motion for Judgment on the Pleadings ("Pl. Mem."), Doc. 13, at 6.)

2. Dr. Jeffrey Nazar, D.C., Treating Chiropractor

Dr. Jeffrey Nazar ("Nazar"), a chiropractor, evaluated and treated Plaintiff for "severe and unrelenting" neck pain from August 17, 2010, several days after her injury, until October 8, 2010, when Nazar referred her to physical therapy. (Tr. 210.) After a roughly three-month break, Plaintiff resumed treatment with Nazar on December 15, 2010, and received treatment from him through the date of the ALJ hearing, although there were some sporadic breaks in her treatment. (*See* Tr. 63, 280-285, 349.)

Based on his examinations and treatment, Nazar completed four narrative reports, a "Return to Work Recommendation" form ("RWF Form") dated April 25, 2011, and a Physical

Capacity Evaluation dated April 11, 2012. (Tr. 209-214, 355-356; 330; 217). The reports indicate that Plaintiff's pain levels and physical limitations either remained the same or increased, although her headaches went from frequent to intermittent between December 2010 and April 2011. (Tr. 210, 212, 214). Three of the reports, as well as the RWF Form, stated Plaintiff was unable to work.[3] (Tr. 210, 212, 217, 356.)

The Physical Capacity Evaluation noted Plaintiff can sit at any one time for one-half hour or less and can stand and/or walk for the same. (Tr. 330.) During an eight-hour work day, Plaintiff must occasionally recline, can cumulatively sit for two hours or less, and can cumulatively stand and/or walk for the same. (*Id.*) Plaintiff must avoid reaching, lifting, and carrying (even weights under ten pounds), but can frequently bend and squat. (*Id.*) Finally, Plaintiff can use both hands for sustained repetitive actions such as fine manipulations and simple grasping/gripping, but not for pushing/pulling or for reaching overhead. (*Id.*)

        3.      Dr. Frederic Mendelsohn, M.D., Treating Neurologist

In addition to Nazar, Plaintiff regularly received treatment from Dr. Frederic Mendelsohn ("Mendelsohn"), a board certified neurologist. Plaintiff saw Mendelsohn for evaluation and administration of medications every four to six weeks between September 2010 and the hearing date. (Tr. 63, 357.)

On September 21, 2010, Plaintiff underwent nerve conduction velocity and electromyography ("NCV/EMG") studies at Mendelsohn's office, which revealed evidence of bilateral C5-6 and C6-7 radiculopathy, right greater than left. (Tr. 258-262.) On August 30, 2011, Mendelsohn repeated the NCV/EMG studies, which again revealed evidence of bilateral C5-6 and C6-7 radiculopathy. (Tr. 253-257.)

---

[3] The fourth report was completed on December 15, 2010 during the period between her injury and the alleged onset date of her disability, while she was still working. (Tr. 213-214.)

4

As part of his treatment, Mendelsohn referred Plaintiff to Dr. Timothy Groth, M.D., a pain specialist who examined Plaintiff several times and administered two cervical epidural steroid injections, once on January 20, 2011 and once on May 6, 2011. (Tr. 215-216, 218-234.) Plaintiff showed no improvement after the second injection, and Groth noted Plaintiff's "disability status" as "100%." (Tr. 216.)

Based on Mendelsohn's examinations, the NCV/EMG's, and the August 2010 MRI, Mendelsohn repeatedly determined that Plaintiff was "totally" or "100%" disabled. (Tr. 288, 342, 344, 346, 348, 357.) Mendelsohn twice provided narrative explanations for these conclusions, on which he based his records, including diagnostic testing and physical examinations of Plaintiff. (Tr. 288, 357). The remaining "100%" or "totally" disabled determinations appear in Doctor's Progress Reports to the New York State Worker's Compensation Board. (Tr. 342, 344, 346, 348, 353.) Although the Administrative Record contains some internal consultation/progress reports from Mendelsohn's files for visits throughout, some gaps appear in the record. (Tr. 271-279.) For instance, there is only one treatment record for all of 2012, and there is no record of Plaintiff's initial visit in September 2010 (other than the above-mentioned NCV/EMG report dated September 21, 2010). (Tr. 354.) And there is also no residual functional capacity assessment from Mendelsohn in the record.

  4.  Dr. Salvatore Palumbo, M.D., and Dr. Thomas Dowling, M.D.

Plaintiff also consulted two spinal specialists. Dr. Salvatore Palumbo, a board certified neurosurgeon, evaluated Plaintiff on June 6, 2011 and again on June 22, 2011, after obtaining an updated MRI. (Tr. 235-239.) The updated MRI revealed a disc herniation at C5-6 encroaching into the neural foramina at the C6 exit zone, much more pronounced on the left side than the

right. (Tr. 239.) As a result, Palumbo believed Plaintiff had neural compression at C6, but recommended conservative care. (*Id.*)

Several month later, on August 3, 2011, Plaintiff was evaluated by Dr. Thomas Dowling ("Dowling"), a board certified orthopedic spine surgeon. Dowling found Plaintiff had paraspinal and trapezial spasm on the right side, with paraspinal tenderness bilaterally. (Tr. 266.) Plaintiff was negative for migraines, but positive for headaches. (*Id.*) Plaintiff had mildly positive right side Spurling signs, with left side Spurling signs showing neck pain only. (*Id.*) Dowling noted that "MRI does not match her symptoms" but that her impairment status was "total temporary." (Tr. 267.) At a second visit on October 4, 2011, Dowling noted Plaintiff exhibited no headaches, but an EMG showed bilateral radiculopathy at C5-6 and C6-7. (Tr. 268-269.) For treatment, Dowling referred Plaintiff for cervical facet blocks on the right side at C6-7, C5-6, and C4-3, and also for an ENT consult for a laryngocele appearing in a myelogram. (Tr. 269.) Dowling again opined that Plaintiff's impairment status was "total temporary." (Tr. 270.)

5. Dr. Andrea Pollack, D.O., and Dr. Kathleen Acer, Ph.D.

The Division of Disability Determination also referred Plaintiff to Dr. Andrea Pollack ("Pollack"), an internist, for a physical examination, and to Dr. Kathleen Acer ("Acer"), a psychologist, for a psychological examination. Both examinations took place on December 20, 2011. (Tr. 289-296.)

Pollack's written report contains mostly "normal" findings, apart from range-of-movement restrictions of Plaintiff's cervical spine. (Tr. 295.) Additionally, Pollack noted the following observations:

> ACTIVITIES OF DAILY LIVING: She is able to cook three times a week, clean twice a week, and do laundry and shop once a week. She showers and dresses herself daily. She watches TV, listens to the radio, reads, and socializes with friends. . . .

6

> GENERAL APPEARANCE, GAIT, STATION: The claimant appeared to be in no acute distress. Gait normal. Can walk on heels and toes without difficulty. Squat full. Stance normal. Used no assistive devices. Needed no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty.

(Tr. 294.) Pollack's medical source statement opines that Plaintiff has "moderate to marked restriction in lifting, carrying, pushing, and pulling. She should avoid heights, operating heavy machinery, activities which require heavy exertion, and activities which put her at risk for fall." (Tr. 296.)

Acer found Plaintiff suffered from adjustment disorder with mixed anxiety and depressed mood, but her prognosis was "fair" and recommended counseling. (Tr. 290.) Acer's findings with respect to Plaintiff's daily activities were similar to Pollack's, but she found that household chores were "limited" because "[Plaintiff] needs a lot of help due to physical issues." (Tr. 290.)

6. Plaintiff's Evidence

Plaintiff completed a Function Report on October 25, 2011 detailing her physical condition and abilities. The report describes Plaintiff's daily activities as: "shower, take child to school, read mail, go outside, straighten up house, cook dinner, go to child's activities, watch tv, go to bed." (Tr. 176.) Plaintiff states that she takes care of her husband and child, prepares lunch for school, and feeds the dog, but that she has pain when drying her hair and sometimes when shaving her legs. (Tr. 176-177.) Plaintiff needs no help to care for her personal needs and grooming, or to take or to remember to take her medicine, but does need help preparing meals, doing laundry, cleaning, and shopping. (Tr. 177-178, 185.) Plaintiff goes outside daily for drives and short walks. (Tr. 179, 181.) She shops twice weekly for half an hour, handles money, pays bills, manages a savings account, and spends time with others in person, on the phone, and at her child's functions. (Tr. 179-180.) The report further indicates that Plaintiff cannot sit or stand for longer than twenty minutes at a time, or walk for more than two blocks without resting.

(Tr. 180-181.) Plaintiff reports pain when reaching, and tingling and numbness when using her hands. (Tr. 181.) The pain is dull and achy from her neck down into her right arm and hand, with constant headaches, and beginning to spread down into her left arm and hand. (Tr. 184.) The pain can last for a few days to a week, and pain medication taken in the past did not help. (Tr. 185.) At the time of the report Plaintiff was not taking any medication for the pain. (Tr. 184.)

At the October 26, 2012 hearing, roughly one year after she completed her Function Report, Plaintiff testified that she had stopped working on April 15, 2011 because her pain was too severe. (Tr. 61.) Plaintiff testified that pain, numbness, tingling, and stiffness in her neck made it difficult to type or speak on the phone, activities which were part of her job duties. (Tr. 62-63.) Plaintiff also testified that she suffered from constant headaches (two or three a week), and migraines once a week, or every other week. (Tr. 63, 65.) With the headaches, Plaintiff can function "to a point," but cannot function at all with a migraine. (Tr. 79-80.)

Also at the hearing, Plaintiff stated she takes various prescription and non-prescription medications for her pain, additional medication for her anxiety, and receives Botox injections for her headaches. (Tr. 64-65.) She testified she did not take any medicine prophylactically for her headaches. (Tr. 66.) In a typical day, Plaintiff will drive locally, shower, and do light household chores such as dusting, folding clothes (with breaks), or loading the washing machine. (Tr. 69-70.) Due to her condition, Plaintiff needs help preparing meals, lifting the laundry basket, and doing regular food shopping. (Tr. 70-71.) Nevertheless, Plaintiff testified that she can run errands including very light grocery shopping, and going to the drugstore or bank. (Tr. 71.) Plaintiff also testified that she attends her daughter's activities, socializes with friends and family, and goes out for dinner. (Tr. 71-72.) Plaintiff explained that she can walk for about a

block before numbness in her arm and pain in her neck begin, and that she can stand for about fifteen minutes and sit for fifteen or twenty minutes before her neck stiffens up. (Tr. 73-74.) Plaintiff testified she can use a computer for five or ten minutes at a time but must take ten or fifteen minute breaks due to discomfort, and can repeat the cycle only about three times due to pain, stiffness, and weakness in her hand. (Tr. 75-76.) Similarly, Plaintiff can write for one or two minutes before weakness sets in, and she can complete about five cycles of writing and resting before having to stop. (Tr. 78.) Plaintiff estimated she could lift or carry about five pounds. (Tr. 74.) In addition to her neck, arm, and hand symptoms, Plaintiff testified to a constant pain, "like a surge," in her left leg that began in August 2012. (Tr. 76-77.) Finally, Plaintiff explained that her condition prevents her from sleeping more than about two hours in a row. (Tr. 80.)

       7.    Other Evidence

Plaintiff's administrative record contains two physical residual functional capacity ("RFC") assessments. The first one is dated January 10, 2012 and signed by M. Isca (the "Isca RFC"). The Isca RFC states that Plaintiff can occasionally: climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and lift and/or carry up to ten pounds; Plaintiff can frequently lift and/or carry less than ten pounds; and can never climb ladders, ropes, or scaffolds. (Tr. 313-314.) In an eight-hour work day, Plaintiff can stand and/or walk for at least two hours, and sit with normal breaks for a total of about 6 hours. (Tr. 313.) Plaintiff can perform unlimited pushing and pulling (other than as limited by lift/carry limitations), and has no manipulative, visual, communicative, or environmental limitations. (Tr. 313-315.) The Isca RFC concludes that Plaintiff retains the ability to do her previous sedentary work. (Tr. 316-317.)

A second RFC was completed on April 16, 2012 by Dr. Sterling Moore (the "Moore RFC"), based on his review of the medical record. The Moore RFC states that Plaintiff can occasionally: climb ramps or stairs, crouch, and crawl; Plaintiff can frequently balance, stoop, kneel, and lift and/or carry up to ten pounds; and can never climb ladders, ropes, or scaffolds. (Tr. 332-333.) In an eight-hour work day, Plaintiff can stand and/or walk for at least two hours, and sit with normal breaks for a total of about 6 hours. (Tr. 332.) Plaintiff can perform unlimited pushing and pulling (other than as limited by lift/carry limitations), and has no visual or communicative limitations. (Tr. 332-333.) However, Plaintiff does have manipulative limitations, including no reaching or handling, but is capable of frequent fingering and feeling. (Tr. 333.) Plaintiff must also avoid concentrated exposure to extreme heat, extreme cold, and vibrations. (Tr. 334.) The Moore RFC notes that the conclusions of treating/examining sources in Plaintiff's file differ significantly from the findings above, and states that the finding of disability made by Drs. Nazar, Mendelsohn, and Dowling, must be reserved to the Commissioner. (Tr. 335.)

Plaintiff's administrative record also includes a mental RFC (the "MRFC") and a Psychiatric Review Technique ("PRT"), both completed by consultant R. Lopez on January 10, 2012, based on a review of the Plaintiff's record. (Tr. 318-321, 298-311.) The PRT notes the presence of depressive syndrome and anxiety, resulting in mild functional limitations of daily living activities and maintaining social functioning, but no difficulty maintaining concentration, persistence, or pace, and no episodes of deterioration. (Tr. 301, 303, 308.) The MRFC indicates Plaintiff has no significant limitations of: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 318-319.) The only exception is that

Plaintiff was determined moderately limited in her ability to set realistic goals and make plans independently of others. (Tr. 319.)

At the October 26, 2012 hearing before the ALJ, impartial vocational expert Rocco Meola ("Meola") testified that Plaintiff's past position as a stenographer/administrator at BOCES would be classified as having a sedentary exertional level, and a specific vocational preparation ("SVP") of 6. (Tr. 82.) Meola testified that a hypothetical individual could perform Plaintiff's past work at BOCES despite the following limitations: limited to sedentary work; could occasionally lift ten pounds; sit for approximately six hours; stand or walk for approximately two hours in an eight-hour work day with normal breaks; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; could perform unlimited pushing and pulling, but was limited to no overhead reaching and frequent handling, fingering and feeling; and must avoid concentrated exposure to extreme cold, heat, vibrations and hazards such as machinery and heights. (Tr. 82.) However, Meola testified that the same hypothetical person who was limited to only occasional handling, fingering and feeling could not perform Plaintiff's past work, and would not be able to work in the competitive labor market. (Tr. 82-83.)

### 8. The ALJ's Decision

The ALJ's December 20, 2012 decision follows the familiar five-step sequential evaluation process for determining whether a claimant is disabled under the Social Security Act as required by 20 C.F.R. 404.1520(a). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since April 15, 2011, the date the Plaintiff alleges she became disabled. (Tr. 17.) At step two, the ALJ found Plaintiff's cervical degenerative disc disease, radiculopathy of the right arm, and headaches were severe impairments, but that her depression,

anxiety, and adjustment disorder were not severe. (Tr. 18.) Pursuant to step three, the ALJ found Plaintiff's impairments, alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (Tr. 18-19.) Before advancing to step four, the ALJ weighed the evidence in Plaintiff's record and determined that Plaintiff had the RFC to:

> occasionally lift 10 pounds, sit for approximately six hours, stand or walk for approximately two hours in an eight hour workday with normal breaks; occasionally climb ramps or stairs; never climb ladders ropes, or scaffolds; occasionally balance, stoop, kneel, crouch and crawl, unlimited push/pull, limited to no overhead reaching and frequent handling, fingering and feeling; avoid concentrated exposure to extreme heat, cold, vibration and hazards, such as machinery and heights.

(Tr. 19.)

In weighing the evidence, the ALJ gave partial credit to Plaintiff's statements to the extent they were consistent with the ALJ's RFC, but discounted Plaintiff's credibility about the "intensity, persistence and limiting effects" of her symptoms after finding Plaintiff's statements were inconsistent with her daily activities. (Tr. 20.)

The ALJ gave Nazar's opinion of Plaintiff's condition zero weight due to perceived "large treatment gaps" and inconsistencies with Plaintiff's daily activities. (Tr. 24.) As a chiropractor, Nazar was treated by the ALJ as an "other medical source," rather than as a "treating physician." (Tr. 23-24.)

Mendelsohn's opinions were likewise afforded zero weight. (Tr. 24.) Although a "treating physician," the ALJ found Mendelsohn's opinions were not supported by the record, and were the sort of ultimate determinations that are reserved to the Commissioner. (*Id.*)

Pollack's opinion was given partial weight because her determination that Plaintiff had "moderate to marked restriction in lifting, carrying, pushing, and pulling" lacked specificity. (Tr.

12

296, 24.) Acer's opinion was given no weight, while the Isca RFC and the Moore RFC were found credible insofar as they were consistent with the ALJ's RFC. (Tr. 25.)

At the fourth step, the ALJ found that Plaintiff retained the capacity to perform sedentary work, including her past relevant work as a stenographer, despite her severe impairments. (Tr. 26.) Thus, Plaintiff was found not to be disabled. (*Id.*)

## II. DISCUSSION

### A. Standard of Review

A final determination of the Commissioner of Social Security upon an application for disability benefits is subject to judicial review as provided in 42 U.S.C. § 405(g). *See* 42 U.S.C. § 1383(c)(3). A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the conclusions were supported by substantial evidence in the record and were based on a correct legal standard. *Lamay v. Comm'r* of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera*

*v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991). The "substantial evidence" test applies only to the Commissioner's factual determinations. Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

### B.    Standard for Determining a Disability

In order to be awarded federal disability benefits under the Social Security Act, a claimant must establish that she has a "disability." *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Under the Act, "disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2004). To be eligible to receive benefits, "an applicant must be 'insured for disability insurance benefits.'" *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A) & 423(c)(1)). Here, the parties do not contest that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015. (Tr. 17). Thus, Plaintiff must prove that she was disabled within the meaning of the Act on or before that date.

When evaluating a claim for disability benefits, the ALJ must follow the five-step procedure set forth by the Commissioner's regulations.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (alterations in original); *see* 20 C.F.R. § 404.1520. The claimant bears the burden of proof for the first four steps of the inquiry, but the Commissioner bears the burden for the fifth step. *Selian*, 708 F.3d 409, 418; *see also Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).yea

### C. The Treating Physician Rule

"The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418 (*citing Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)); *see also Shaw*, 221 F.3d at 134 ("[T]he medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other ... evidence."); 20 C.F.R. § 404.1527(c)(2). If the ALJ decides against giving the opinion of a treating physician controlling weight, various factors must be applied to decide how much weight the opinion will be given. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), 3-5. The ALJ must consider: 1) the length of the treatment relationship and the frequency of examination; 2) the

15

nature and extent of the treatment relationship; 3) the relevant evidence supporting the opinion, particularly medical signs and laboratory findings; 4) the consistency of the opinion with the record as a whole; and 5) whether the physician is a specialist in the relevant medical area. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

Additionally, when the treating physician's opinion is not given controlling weight, the ALJ must give good reasons for the weight that is given. 20 C.F.R. § 404.1527(c)(2). Failure to give such reasons is alone grounds for remand. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)); *Milien v. Astrue*, 10–CV–2447 JG, 2010 WL 5232978, at *8 (E.D.N.Y. Dec.16, 2010) (citing former 20 C.F.R. § 404.1527(d)(2) and *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir.2004)). While the opinion of a treating physician may be properly denied controlling weight if inconsistent with other evidence, "not all expert opinions rise to [a] level ... that is sufficiently substantial to undermine the opinion of [a] treating physician." *Burgess*, 537 F.3d at 128. For example, vague consultative opinions describing a claimant's limitation in terms such as "mild" or "moderate" are insufficient to undermine the opinion of a treating physician. *Martinez v. Colvin*, No. 13-CV-0834 FB, 2014 WL 2042284, at *3 (E.D.N.Y. May 19, 2014) (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)); *see also Selian*, 708 F.3d 409, at 421.

### D.   Analysis

The ALJ improperly accorded Mendelsohn's opinion zero weight. As a treating physician, Mendelsohn's findings are entitled to controlling weight, unless the ALJ sets forth good reasons for discounting them. 20 C.F.R. § 404.1527(c)(2). To give less than controlling weight, the ALJ is obliged to consider statutory factors in order to determine what weight to give. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), 3-5. The factors here weigh in favor of giving

16

Mendelsohn's findings at least some weight. First, Plaintiff saw Mendelsohn every four to six weeks, from shortly after her injury in 2010 through the time of the hearing, for physical evaluations and administration of prescription medication. (Tr. 63, 357.) Next, Mendelson's opinions are based on his relationship with Plaintiff, as well as on objective medical tests including MRI's and EMG/NVC assessments. (Tr. 253-262, 274, 288.) Mendelsohn's opinion that Plaintiff was unable to work due to her condition is consistent with the record as a whole. Following the alleged onset date, Nazar, Groth, and Dowling all examined Plaintiff and found her symptoms resulted in "total" or "100%" impairment. (Tr. 216, 217, 267, 270, 356.) Finally, Mendelsohn is a specialist in the treatment of spine disorders of the type Plaintiff suffers. Therefore, all of the required factors for assessing treating physician opinions weigh in favor of crediting Mendelsohn's opinions to some extent.

Despite the statutory factors in favor of crediting Mendelsohn, the ALJ accorded him zero weight and failed to give "good reasons" for doing so. *See* 20 C.F.R. § 404.1527(c)(2). The ALJ stated that Mendelsohn's opinions of total disability were not based on the record, that the record shows Plaintiff had a normal gait, did not use any assistive devices, and engaged in significant activities of daily living. (Tr. 24.)

First, Plaintiff's normal gait and non-use of assistive devices are not "good reasons" to discount Mendelsohn's finding that Plaintiff was unable to work. Mendelsohn treated Plaintiff for neck and arm pain, numbness, weakness, headaches, and limited range of cervical motion – none of which involve the middle or lower back, or legs. (Tr. 357.) Normal gait and non-use of assistive devices therefore does not contradict Mendelsohn's opinions that Plaintiff was unable to work due to the impairments he treated.

Second, Plaintiff's daily living activities also do not provide a "good reason" for failing to give any credit to Mendelsohn's conclusions. There is no RFC or similar detailed assessment of Plaintiff's physical limitations from Mendelsohn in the record. Without such an assessment from Mendelsohn, the ALJ could not know whether Plaintiff's evidence of her daily activities contradicted his assessment of her physical limitations and ability to work. Thus, the ALJ failed to give good reasons for discounting Mendelsohn's opinion to zero, and remand is appropriate. *See Augustine v. Astrue*, No. 11 CIV. 3886 BMC, 2012 WL 2700507, at *10-11 (E.D.N.Y. July 6, 2012) (ALJ's failure to give good reasons for discounting treating physician's opinion violated the treating physician rule.) Furthermore, the ALJ has an affirmative duty to develop the record where the treating physician's reports are conclusory or otherwise inadequate to provide a basis for evaluation. *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999); *Kitt v. Comm'r of Soc. Sec.*, No. 14-CV-5632 JG, 2015 WL 4199281, at *9 (E.D.N.Y. July 13, 2015) (ALJ failed to develop the record where record did not include an RFC from claimant's treating physicians.) Not only is there no RFC from Mendelsohn, there are obvious gaps in the record; Plaintiff testified before the ALJ that she saw Mendelsohn regularly for evaluations, prescription medications, and ongoing diagnostic testing since the fall of 2010. (Tr. 63.) Yet, the record contains only one treatment record for all of 2012. (Tr. 354.) The ALJ may not write off a treating physician's assessment of total disability as an "ultimate determination" that is "reserved to the Commissioner" while simultaneously abnegating her duty to develop the record. *Gallo v. Astrue*, No. 10-CV-1918 JG, 2010 WL 3999093, at *6 (E.D.N.Y. Oct. 12, 2010) (Gleeson, J.) (where ALJ rejected treating physician's opinion as ultimate decision reserved to Commissioner, failure to obtain RFC from treating physician was problematic).

The ALJ also erred in giving zero weight to Nazar's opinions. As an initial matter, Nazar is not covered by the treating physician rule because he is a chiropractor. *See Rosario v. Colvin*, No. 13-CV-5573 NGG, 2015 WL 3862683, at *9 (E.D.N.Y. June 22, 2015); 20 C.F.R. 404.1513(a)(1-5) (defining "acceptable medical source" for the purpose of the treating physician rule as a licensed physician, psychologist, optometrist, podiatrist, or speech language pathologist). Thus, the ALJ appropriately treated Nazar as an "other medical source." (Tr. 24.)

Nevertheless, the ALJ improperly accorded Nazar's opinions zero weight. The ALJ cited "large treatment gaps" and contradictions between Nazar's opinions and Plaintiff's statements regarding her physical limitations. However, the record clearly shows Nazar treated Plaintiff regularly throughout 2011 and during 2012, the period the ALJ claims as a gap. (Tr. 24, 63, 280-285, 355.) Moreover, Plaintiff's evidence regarding her physical limitations is not so contrary to Nazar's assessment of her limitations that his opinion should be given no weight for this reason alone. Plaintiff testified at the hearing and in her Function Report to significant limitations in walking (one-two blocks), sitting (twenty minutes), standing (fifteen-twenty minutes), reaching, using a computer, writing, and lifting weight (about five pounds). (Tr. 70-74, 176-186.) Plaintiff also stated she drives locally, runs light errands, and engages in social activities with friends and family. (Tr. 176-186.) Nazar found Plaintiff could walk, sit, and stand for thirty minutes or less, but should avoid carrying up to ten pounds and reaching. (Tr. 330.) He also determined she could cumulatively sit for less than 2 hours during an eight hour work day and stand/walk for the same. (*Id.*) Plaintiff's evidence of her physical limitations and light errands do not facially contradict Nazar's assessment. Although the ALJ has discretion to determine the proper weight to give a chiropractor's opinions, as an "other medical source," Nazar's opinions "should not be discounted arbitrarily." *Hinds v. Barnhart*, No. 03-CV-6509 (JG), 2005 WL

19

1342766, at *9 (E.D.N.Y. Apr. 18, 2005) (citing *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir.1995)); s*ee also Schultz v. Colvin*, No. 1:14-CV-538 GTS, 2015 WL 2248753, at *5 (N.D.N.Y. May 13, 2015) ("an ALJ cannot discredit the opinion of an "other source" solely because it is an "other source.""). Because her reasons were premised on a misreading of the record and conclusory, the ALJ's decision to accord Nazar zero weight was not supported by substantial evidence. *See Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023 MKB, 2013 WL 1193067, at *11 (E.D.N.Y. Mar. 22, 2013) (requiring the ALJ to offer more than conclusory reasons for according chiropractor "little weight").

## III. CONCLUSION

Accordingly, for the reasons explained above, the Commissioner's Motion for Judgment on the Pleadings (Doc. 15) is **DENIED**, Plaintiff's Cross Motion for Judgment on the Pleadings (Doc. 13) is **GRANTED** to the extent it seeks remand, and this matter is remanded to the Commissioner for further development of the record and proper assessments of the weight to be accorded to the medical opinions of Nazar and Mendelsohn. The Clerk of Court is respectfully requested to enter judgment accordingly and close this case.

**SO ORDERED**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: July 7, 2017
Brooklyn, New York